UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CANDANCE KAGAN, et al.**<br>    **Plaintiffs** | **CIVIL ACTION** |
| **VERSUS** | **No. 11-3052** |
| **CITY OF NEW ORLEANS**<br>    **Defendant** | **Section "E"** |

## ORDER AND REASONS

Before the Court are cross-motions for summary judgment filed by plaintiffs Candance Kagan, Mary LaCoste, Joycelyn Cole, and Annette Watt (together, "Plaintiffs"), and defendant City of New Orleans (the "City").[1]  For the following reasons, the City's motion is **GRANTED** and Plaintiffs' motion is **DENIED**.

## BACKGROUND

Plaintiffs are tour guides in New Orleans, where they give walking tours of historical sites and points of interest.  Some of their tours are educational, focusing on topics such as the history of the French Quarter; some are fanciful, focusing on topics like ghosts and vampires; and some are mostly gustatory or libationary, taking advantage of New Orleans' many restaurants and bars.[2]  Participants pay for the tours at issue by paying either Plaintiffs or the organizations for which they work.[3]  Like New York, the District of

---

[1]   R. Docs. Nos. 22, 25.

[2]   R. Doc. No. 22-4, pp. 11, 16, 20–22; R. Doc. No. 22-5, pp. 18–19; R. Doc. No. 22-6, pp. 12–13, 20; R. Doc. No. 22-7, pp. 12–13.

[3]   R. Doc. No. 22-4, pp. 19–22; R. Doc. No. 22-5, pp. 18–19; R. Doc. No. 22-6, pp. 13, 20; R. Doc. No. 22-7, pp. 12–13.

1

Columbia, Philadelphia, Savannah, Charleston, and the National Park Service, the City requires Plaintiffs to have a license when, in this way, they "conduct tours for hire." N.O. City Code § 30-1551.[4]

In order to obtain a license, prospective tour guides must pay a $50 fee, pass a written examination, clear a drug test, and undergo fingerprinting and a background check to ensure that they have not been convicted of a felony in the preceding five years.[5] In order to maintain the license, tour guides must pay a $20 fee and successfully complete the drug test and background check, which requires another set of fingerprints, every two years.[6] The City asserts that this licensing scheme is necessary to ensure that: (1) tour guides have "sufficient knowledge to conduct tours of points of interest in the City"; (2) tour guides have

---

[4] *See Edwards v. Dist. of Colum.*, 765 F. Supp. 2d 3, 10 n.6 (D.D.C. 2011) (collecting ordinances). Counsel for Plaintiffs in this matter filed a challenge to the D.C. ordinance, which failed, *see Edwards v. Dist. of Colum.*, 2013 WL 1881547, at *13 (D.D.C. May 7, 2013), as well as to the Philadelphia ordinance, which was dismissed on ripeness grounds, *Tait v. City of Philadelphia*, 410 F. App'x 506 (3d Cir. 2011).

[5] N.O. City Code § 30-1553(2)–(3) (written exam and no felonies in preceding five years); *id.* § 30-1557(1) ($50 fee); R. Doc. No. 22-8, p. 30 (background check); *id.* at p. 35 (drug test). The City also has the discretion to require a verbal examination and interview, N.O. City Code. § 30-1553(3), but there is no evidence the City has required this of Plaintiffs (or anyone else for that matter) and there is no evidence what this additional step would look like (in form, content, factors considered, decisions, etc.) if the City ever did require it. Consideration of this requirement is therefore not ripe. *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987) (noting ripeness problems when "further factual development is required"). The Court will not address the fee either, as Plaintiffs do not suggest it is unconstitutional.

[6] N.O. City Code § 30-1554 (renewal every two years); *id.* § 30-1557(2) ($20 fee); R. Doc. No. 22-8, pp. 32–33 (background check every two years); *id.* p. 35 (drug test every two years).

no "criminal backgrounds that would pose a threat of harm or danger to tour groups"; (3) members of tour groups are protected from "behavior that may be associated with illicit drug use"; and (4) "unqualified individuals purporting to conduct reputable tours . . . [do not] swindle trusting tourists out of money."[7]

Plaintiffs believe those justifications are insufficient under the First Amendment, and they ask the Court for a declaratory judgment that the City's licensing scheme violates their right to free speech, both facially and as applied. They also request a permanent injunction prohibiting the City from enforcing the licensing requirement, $1.00 in nominal damages, and attorneys' fees.[8] The City requests a determination that its licensing scheme is constitutional under the First Amendment.[9]

### STANDARD OF LAW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991). If the moving party fails to carry this

---

[7] R. Doc. No. 22-3, p. 3.

[8] R. Doc. No. 1, pp. 8–9.

[9] R. Doc. No. 25, p. 1.

burden, the motion must be denied. If the moving party successfully carries this burden, the burden then shifts to the non-moving party to show that a genuine issue of material fact exists. *Id.* at 322-23. Once the burden has shifted, the non-moving party must direct the Court's attention to something in the pleadings or other evidence in the record that sets forth specific facts sufficient to establish that a genuine issue of material fact does indeed exist. *Id.* at 324.

If the dispositive issue is one on which the non-moving party will bear the burden of proof at trial, however, the moving party may satisfy its burden by simply pointing out that the evidence in the record is insufficient with respect to an essential element of the non-moving party's claim. *See Celotex*, 477 U.S. at 325. The nonmoving party must then respond, either by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party" or by coming forward with additional evidence. *Celotex*, 477 U.S. at 332-33 & 333 n.3.

"An issue is material if its resolution could affect the outcome of the action." *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005). When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008); *see also Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 150-51 (2000). All reasonable inferences are drawn in favor of the non-moving party. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party, thus entitling the moving party to judgment as a

matter of law. *Smith v. Amedisys*, 298 F.3d 434, 440 (5th Cir. 2002). In this case, the facts are not in dispute—only which facts are relevant and whether the parties have met the burdens of proof they would have at trial.

## ANALYSIS

The First Amendment provides that Congress "shall make no law . . . abridging the freedom of speech." U.S. CONST. amend I. The Supreme Court has interpreted this to mean that "'as a general matter, . . . the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *United States v. Stevens*, 130 S.Ct. 1577, 1584 (2010) (quoting *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002)). There is no suggestion that the City's licensing regime operates to restrict speech because of its message or ideas, what is otherwise called viewpoint discrimination. Plaintiffs instead argue that the licensing scheme is a content-based or subject-matter restriction on speech, and so it may be upheld only if "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." *Serv. Empls. Int'l Union, Local 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010) (internal quotation marks omitted). The City asserts that its licensing scheme is content neutral, and so it may be upheld so long as it is "narrowly tailored to serve a significant government interest, and leave[s] open ample alternative channels of communication." *Id.*

### I.     Content Neutrality

In the first instance, it is unclear the City's licensing scheme regulates speech at all. The City Code provision imposing the license requirement makes no reference to speech and merely states that "No person shall conduct tours for hire in the parish who does not possess a tour guide license issued by the department of safety and permits." N.O. City

Code § 30-1551. On its face, this regulates "conduct[ing] tours for hire," not speech. In order to find a reference to speech, it is necessary to look to the City Code's definition of "tour guide," which is "any person duly licensed by the department of safety and permits to conduct one or more persons to any of the city's points of interest and/or historic buildings, parks or sites, for the purpose of explaining, describing or generally relating the facts of importance thereto." N.O. City Code § 30-1486. But that definition in Section 30-1486 does not itself impose any restrictions on speech or conduct, and the licensing requirement in Section 30-1551 does not incorporate the defined term "tour guide"—by, for example, stating that "'Tour guides' must possess a license when working for hire" or "No 'tour guide' shall conduct tours for hire without a license." The licensing requirement in Section 30-1551 instead applies to any "person" who "conduct[s] tours for hire." On its face, therefore, the portion of the City Code imposing the licensing requirement applies to conduct, not speech.

Plaintiffs have nevertheless adduced competent summary judgment evidence that the City's definition of "conduct[ing] tours for hire" in Section 30-1551 makes reference to speech in operation, because the relevant officials use language similar to the speech-based definition of "tour guide" in Section 30-1486 to inform what it means to "conduct" tours for hire and, thus, to determine when a license is required.[10] That the licensing scheme requires a license when points of interest and historic sites are explained or discussed is not sufficient to render it a content-based regulation of speech, however. "A content-based

---

[10] R. Doc. No. 22-8, p. 12 ("So when [the ordinance] says conduct, what does that mean? Conduct is if they are speaking, giving any type of historical background on certain sites.").

6

regulation has been defined as one that creates distinctions between 'favored speech' and 'disfavored speech.'" *Serv. Empls. Int'l Union*, 595 F.3d at 596. A content-based regulation "also can be identified when it creates a 'substantial risk of eliminating certain ideas or viewpoints' from the public forum." *Id.* (quoting *Horton v. City of Houston, Tex.*, 179 F.3d 188, 193 (5th Cir. 1999)). "If, on the other hand, the regulation is justified without reference to the content of the speech or serves purposes unrelated to the content, it is a content-neutral regulation, even if it has an incidental effect on some speakers or messages but not others." *Horton*, 179 F.3d at 193; *see Asgeirsson v. Abbott*, 696 F.3d 454, 459–60 (5th Cir. 2012) ("A regulation is not content-based, however, merely because the applicability of the regulation depends on the content of the speech. A statute that appears content-based on its face may still be deemed content-neutral if it is justified without regard to the content of the speech."). So while it has been said that "[a] regulatory scheme that requires the government to examine the content of the message that is conveyed is content-based," *Serv. Empls. Int'l Union,* 595 F.3d at 596, "'[t]he fact that a statute *refers* to the content of expression does not necessarily make it content-based if it was enacted for a valid purpose *other* than suppressing the expression due to a disagreement with the message conveyed or a concern over the message's direct effect on those who are exposed to it.'" *Illusions–Dallas Private Club, Inc. v. Steen*, 482 F.3d 299, 308 (5th Cir. 2007) (quoting *Ranch House, Inc. v. Amerson*, 238 F.3d 1273, 1278 (11th Cir.2001)) (emphasis in original).

The City's tour guide licensing scheme does not create classes of "favored" and "disfavored" speech. It does not create a substantial risk of eliminating certain ideas or viewpoints. And while the licensing scheme does, in operation, "refer[] to the content of expression" because it applies only when persons conduct others for hire and "giv[e] any

type of historical background on certain sites," it clearly was not enacted to suppress "expression due to a disagreement with the message conveyed or a concern over the message's direct effect on those who are exposed to it." *Steen*, 482 F.3d at 308. It was, instead, enacted to protect the City's tourism industry by protecting the safety of tour group participants and reducing the chance they will be swindled.[11] The City cites as an example of the problems unlicensed tour guides can cause, faux tour guides who are really "panhandlers" and "harass people into giving them money after they offer information."[12] The City has an interest in preventing this kind of conduct. Its interest is in preventing tourists from feeling scammed or harassed—not in policing what is said or heard.[13]

This is clear from the way the City's licensing scheme works. A tour guide may say whatever he or she wishes about a site, or anything else for that matter—the City does not regulate the content of tour guides' speech.[14] There are no scripts, no sacred cows of

---

[11]   The four justifications articulated by the City, *see supra* n. 7 and accompanying text, collapse into these two categories.

[12]   R. Doc. No. 25-2, p. 26; *see also* R. Doc. No. 22-10, pp. 37–42 (describing other instances of unlicensed tour guides); R. Doc. No. 22-12, pp. 9–30 (discussing incidents in further detail).

[13]   R. Doc. No. 22-10, pp. 41–42 ("Q: What does the City allege was the harm that occurred in each of these incidents [involving unlicensed persons caught conducting tours]? . . . . A: I couldn't speak specifically to these cases. But talking to our investigators prior to — once they let those individuals [participating in the unlicensed tours] know those individuals [conducting the unlicensed tours] were no licensed, they were — they were kind of upset."); *id.* at 43 (describing this as "scamming" the unwitting participants in the unlicensed tour); *id.* at 52–53 (describing City's interests).

[14]   *E.g.*, R. Doc. No. 25-2, pp. 23–24 ("Has anyone with the City of New Orleans ever provided you a script that you must follow on any of your tours? No. . . . . [H]as anyone in the City of New Orleans ever told you that you cannot speak about a certain topic on your tours? No."). The

8

historical truth, no restraints on taste or opinion, and no topic (point-of-interest related or not) is off limits. *Compare United States v. Alvarez*, 132 S. Ct. 2537, 2540 (2012) (overturning a ban on a certain kind of false, non-commercial speech). The only reason reference to the content of a tour guide's speech is necessary at all in Section 30-1486 or in the administration of the licensing scheme is because it would otherwise be difficult to describe the act, the conduct, requiring a license.

Commercial tour guides are commercial tour guides because, in exchange for money, they lead people around while speaking about points of interest. The City must "refer" to that speech to define this conduct, *Steen*, 482 F.3d at 308, but it need not (and does not) "examine the content of the message" that speech conveys. *Serv. Empls. Int'l Union*, 595 F.3d at 596; *see Nat'l Assn. for Advancement of Psychoanalysis v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1054 (9th Cir. 2000) ("California's mental health licensing laws are content-neutral; they do not dictate what can be said between psychologists and patients during treatment.").[15] And unlike in *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2724 (2010), "the conduct triggering coverage under the statute" does not "consist[] of communicating a message."[16] The conduct triggering coverage consists of an act—guiding

---

        testimony of all Plaintiffs is substantially the same. R. Doc. No. 25-3, p. 23; R. Doc. No. 25-4, pp. 21, 23; R. Doc. No. 25-5, pp. 15–16.

[15]    The Court does not suggest that tour guides are comparable to doctors, lawyers, accountants, or even fortune tellers necessarily. *See Moore-King v. County of Chesterfield, Va.*, 708 F.3d 560, 568 (4th Cir. 2013). This part of the Ninth Circuit's holding relates to the content neutrality *vel non* of California's mental health statutes, not whether they deserve special deference because they regulate a profession.

[16]    In *Humanitarian Law Project*, "Plaintiffs want[ed] to speak to [two foreign terrorist organizations], and whether they [could] do so under [under the statute] depend[ed] on what they sa[id]." 130 S. Ct. at

people around the city for hire—that only incidentally involves communicating a message. In this way, providing a tour is different from publishing a book or giving a lecture on New Orleans history, because those activities involve only speech. The entire difference, in fact, between buying a book or attending a lecture on New Orleans history and purchasing a tour is the act of being guided around.

That the City's licensing scheme is directed at the non-speech-related risks of this activity, namely that customers could be scammed or put in danger by their tour guides, is clear from the City's willingness to allow licensed tour guides to perform ghost and vampire tours. If the City's concern in protecting tourists from feeling "scammed" were that tour guides speak only some official version of truth (because of "disagreement with the message conveyed" otherwise) or in the potential harms of untrue speech directed at tour group participants ("the message's direct effect on those who are exposed to it"), the City would be hard pressed to permit tours focused on the supernatural. *Steen*, 482 F.3d at 308. That the City does allow such tours shows its true interest: making sure tour group participants get what they pay for, *viz.*, a safe tour, conducted by someone with a minimum quantum of professionalism.

The City's concern that tour group participants not feel scammed is therefore unrelated to concerns about the *content* of tour guides' *speech*. The City's concern is instead related to the *quality* of the *consumer's experience*, which a City dependent on tourism has a substantial interest in protecting. The City protects that experience by weeding out tour guides too dangerous to lead strangers around a strange city and too

---

2723–24. Unlike in this case, that was a restriction on pure speech.

unserious to be willing to study for a single exam.[17] People who meet those minimal qualifications are then free to provide whatever kinds of tours the market will support. As the City's licensing scheme is "justified without regard to the content of [tour guides'] speech," it is content neutral.[18] *Asgeirsson*, 696 F.3d at 459–60.

## II.   Intermediate Scrutiny

The Fifth Circuit uses the test set out in *United States v. O'Brien*, 391 U.S. 367 (1968), to evaluate the constitutionality of content-neutral speech regulations. *Horton*, 179 F.3d at 194. The regulation must: (1) be "'within the constitutional power of the Government'"; (2) "'further[] an important or substantial governmental interest'"; (3) that is "'unrelated to the suppression of free expression'"; and (4) "'the incidental restriction on

---

[17]   Plaintiffs assert that if this is true, "then similar examinations could be required for book authors and newspaper editors." R. Doc. No. 22, p. 18. But authors and editors provide pure information; they do not, by virtue merely of putting their products into the stream of commerce, hold themselves out as possessing the knowledge or ability to provide a particular person with a particular service. A person who holds himself out as having the occupation of tour guide does make that representation, just as a person who holds himself out as a barber makes a representation that he knows how to cut hair. The First Amendment requires *information* be offered *caveat emptor*, but life could hardly go on if all *services*—that is, information plus conduct—had to be offered on that basis.

[18]   Because the Court concludes that the City's licensing scheme is content neutral, the Court need not decide whether the professional speech doctrine, if one exists in the Fifth Circuit, applies. *See Lowe v. S.E.C.*, 472 U.S. 181, 232 (1985) (White, J., concurring) ("The power of government to regulate the professions is not lost whenever the practice of a profession entails speech."); *Thomas v. Collins*, 323 U.S. 516, 544–45 (1945) (Jackson, J., concurring) ("A state may forbid one without its license to practice law as a vocation, but I think it could not stop an unlicensed person from making a speech about the rights of man or the rights of labor, or any other kind of right, including recommending that his hearers organize to support his views.").

alleged First Amendment freedoms is not greater than is essential to the furtherance of that interest.'" *Id.* (quoting *O'Brien*, 391 U.S. at 377).

"As [the City's licensing scheme] is on balance a content-neutral rule, the third prong of the *O'Brien* test has been satisfied." *Horton*, 179 F.3d at 194. The City unquestionably has the power to license businesses as part of its police powers, meaning that the first prong is satisfied as well. *See Nat'l Assn. for Advancement of Psychoanalysis*, 228 F.3d at 1054 ("'It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings . . . .'" (quoting *Watson v. Maryland*, 218 U.S. 173, 176 (1910))); *People v. Bowen*, 175 N.Y.S. 2d 125, 128 (N.Y. Sp. Sess. 1958) ("Certainly the licensing of sightseeing guides in a large metropolis falls within the police powers of the local government."). So, the second and fourth *O'Brien* factors remain.

Courts analyze the remaining *O'Brien* factors together and ask whether the challenged regulation is "narrowly tailored to serve a significant government interest and . . . leave[s] open ample alternative channels of communication." *Hays County Guardian v. Supple*, 969 F.2d 111, 118 (5th Cir. 1992). The City's licensing scheme satisfies the last requirement, as Plaintiffs do not need a license to speak and lead tours whenever, wherever, and containing whatever they please, just so long as they do not charge for them.[19]

---

[19] The City Code is clear on this point—only persons who conduct tours "for hire" must have a license—and Plaintiffs have not come forward with any evidence that the City in fact fails to respect this distinction. N.O. City Code § 30-1551; *see* R. Doc. No. 22-10, p. 12 ("Q: So if I'm conducting a free tour, I do not have to hold a tour guide license; if I'm not charging anyone any money for the tour, I don't have to have a license; is that correct? [Objection by City.] [A:] It's my understanding, that's correct. Yes.") (deposition of Malachi Hull, Deputy Director for the New Orleans Department of Safety and Permits).

*Edwards v. Dist. of Colum.*, 765 F. Supp. 2d 3, 19 (D.D.C. 2011) ("Prior to obtaining a license, plaintiffs still may engage in expressive activity by doing everything they do now except for conducting their tours for profit. The Court therefore concludes that the means of communication available to plaintiffs are adequate." (international quotation marks and alterations omitted)). Accordingly, the only question is whether the City has shown that it has a "substantial governmental interest" that is narrowly tailored, or in the language of the Supreme Court, "would be achieved less effectively absent the regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989).

      A.     *The Testing Requirement*

The City asserts that it has a substantial governmental interest in ensuring that tour guides have "sufficient knowledge to conduct tours of points of interest in the City" and in preventing "unqualified individuals purporting to conduct reputable tours . . . [from] swindl[ing] trusting tourists out of money."[20] Stated this way, the City's "interests in protecting the public from 'fraud, crime, and undue annoyance' are 'indeed substantial.'" *Int'l Soc'y for Krishna Consciousness of Houston, Tx. v. City of Houston, Tex.*, 689 F.2d 541, 550 (5th Cir. 1982). That is, protection of the City's tourism-based economy and its residents and visitors from false or misleading offers of a service, such as a tour guide who has no basis on which to "guide" anyone, is clearly a substantial interest. *Id.*; *see One World One Family Now v. City of Miami Beach*, 175 F.3d 1282, 1288 (11th Cir. 1999); *Smith v. City of Fort Lauderdale, Fl.*, 177 F.3d 954, 956 (11th Cir. 1999); *United States v. Mahoney*, 247 F.3d 279, 286 (D.C. Cir. 2001). If individuals may hold themselves out as

---

[20]    R. Doc. No. 22-3, p. 3.

13

tour guides despite having no knowledge about the City or its points of interest, their customers—many of them the tourists vital to the City's economy—are likely to, in the City's language, "feel scammed."[21] Scammed tourists are not often repeat tourists.

Plaintiffs assert that this is not the City's true interest. Plaintiffs allege the City's true interest is in "[p]olicing the conveyance of accurate information."[22] As support, they cite one of the City's examples of tourists' complaints, namely ill-informed tour guides saying a particular house is "Brad Pitt's house, when it's not Brad Pitt's house."[23] But there is no evidence that the City seeks to enforce some orthodoxy about its history. The City does not police at all what tour guides actually say—nor could it, given that it would be difficult to decide what information is "accurate" about ghosts and vampires or the "best" spots to eat and drink. What the City tries to ensure is that a tour guide possesses some minimum quantum of information. It does so to increase the likelihood that tour group participants will get the tour they bargained for.

So, this is neither a case where "Government seeks to use its full power, including the criminal law, to command where a person may get his or her information," *Citizens United v. Fed Election Comm'n*, 130 S. Ct. 876, 908 (2010), nor one where government "seek[s] to keep people in the dark for what government perceives to be their own good." *33 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) (plurality opinion). This is

---

[21]    R. Doc. No. 22-10, p. 17.

[22]    R. Doc. No. 22, p. 17.

[23]    R. Doc. No. 22, p. 17.

a case about the sale of an in-person service, not information.[24] Once a tour guide demonstrates sufficient knowledge to pass the test, he may sell his services. In the course of doing so, he may provide whatever information he likes.[25] The testing requirement simply helps to ensure that tour guides have some reasonable basis for holding themselves out as such—something even Plaintiffs agree should be the case.[26]

Plaintiffs' focus their attack on the testing requirement on the "substantial or important" interest prong of the test and do not seriously contest that the City's interest "would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 800. It is clear to the Court that the test furthers the City's interest. A test like that used by the City is the best way of weeding out cheats, because people unwilling or unable to learn about the City's history are unlikely to pass the test. The City's testing requirement therefore passes intermediate scrutiny.

### B. The Drug Testing and Background Check Requirements

---

[24] Plaintiffs' reliance on *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011), is therefore misplaced. That case concerned a prohibition on "pharmacies and other regulated entities from selling or disseminating . . . *information*." *Id.* at 2662 (emphasis). There was no challenge to a rule that "pharmacies" and the "other . . . entities" had to be "regulated"—heavily regulated, in fact, and usually with licensing requirements—to hold themselves out as competent to have and to give the information.

[25] Consistent with *Sorrell*, once properly licensed (or "regulated"), there is no prohibition on what information a tour guide may provide as part of selling his service.

[26] R. Doc. No. 22-4, p. 39 ("Q: Would you agree that a tour guide should have some basic competency to conduct a tour? A: Yes.") (deposition of Candance Kagan); R. Doc. No. 22-5, p. 30 (same, Mary LaCoste); R. Doc. No. 22-6, p. 26 (same, deposition of Joycelyn Cole); R. Doc. No. 22-7, p. 22 (same, deposition of Patricia Watt).

The City asserts that it has a substantial governmental interest in ensuring the safety of tour group participants by protecting them from the "threat of harm or danger" posed by recent felons and from "behavior that may be associated with illicit drug use."[27] There can be no doubt that the government has a "substantial" interest in protecting persons from exploitation by recent felons and in protecting others from the harmful effects of illicit drugs. *See, e.g., Nat'l Treasury Empls. Union v. U.S. Customs Serv.*, 27 F.3d 623, 630 (D.C. Cir. 1994); *Willner v. Thornburgh*, 928 F.2d 1185, 1193 (D.C. Cir. 1991). There also can be no doubt that those concerns are "real, not merely conjectural" in this context. *Time Warner Entm't Co., L.P. v. United States*, 211 F.3d 1313, 1318–19 (D.C. Cir. 2000). Tour groups often have many out-of-town participants who cannot be expected to be familiar with the City and its neighborhoods. A predatory tour guide is therefore in a unique position to lead tourists into situations where the tour guide or others may victimize them, an unscrupulous tour guide is in a unique position to expose tourists to drugs or drug-related activity, and an impaired tour guide is in a unique position to lead tourists into danger or leave them feeling scammed.

Plaintiffs do not seriously contend otherwise.[28] Instead, they assert that the drug screen and background check, for which fingerprinting is necessary, are not narrowly tailored to serve the City's interest. As evidence of this, Plaintiffs assert that emergency medical technicians, escorts, and private investigators perform services where the danger

---

[27] R. Doc. No. 22-3, p. 3.

[28] R. Doc. No. 22-4, p. 39 ("Q: Would you agree that the City has an interest in regulating public safety? A: To an extent, yes.") (deposition of Candance Kagan); R. Doc. No. 22-7, p. 22 ("Q: And would you agree that the City of New Orleans has an interest in protecting the public's safety? Q: Yes.") (deposition of Patricia Watt).

to the public of employing a felon is higher, yet the City does not require biennial fingerprinting for these licenses.[29] But the issue is not fingerprinting anymore than it is providing a name or birth date—those are simply the components of a reasonable background check. If the background-check requirement stands, so must any reasonable way in which the City chooses to perform it.[30]

In any event, a third of Plaintiffs' statement is wrong and the rest is misleading. Escorts *are* required to "furnish all the information required" for an "escort service license," which includes fingerprints in addition to considerably more background information than required of a tour guide. N.O. City Code § 30-532; *id.* § 30-502. That "license[] or permit[] . . . expire[s] on December 31 of each calendar year." *Id.* § 30-471. The actual requirements the City imposes on applicants for a private investigator's license do not appear in the record, and the City Code leaves them unclear. But the City does subject those applicants to a more demanding "good moral character" test before licensing and does require they find "not less than five reputable citizens of the city" to verify their application. N.O. City Code § 30-1148. Finally, in addition to all the other local regulations and fitness requirements they must satisfy, emergency medical technicians must "possess a state EMT permit and a national registry of EMT certification," *id.* § 62-92(c)(1), both of which require

---

[29] R. Doc. No. 22, p. 21.

[30] Whatever the outer contours of the form of a reasonable background check, it is clearly permissible to require fingerprints at the time the background check is performed. There is no equally accurate way to verify the identity (and therefore the accuracy of the background check) of the applicant. This is as true when repeating a background check as it is when performing it initially.

17

a background check and yearly or biennial renewal.[31]

Even a cursory examination of the relevant licensing guidelines reveals that Plaintiffs' suggestion—that the City imposes fewer requirements designed to protect public safety or uses less oversight when licensing escorts, emergency medical technicians, and private investigators—simply does not hold water. But if it did, the City's substantial interest in protecting tourists from predatory, unscrupulous, and impaired tour guides still "would be achieved less effectively absent the" background check using fingerprints. *Ward*, 491 U.S. at 800. That is all that is required.

The record is silent on the issue whether the City requires escorts, emergency medical technicians, and private investigators to pass a biennial drug screen. Plaintiffs assert that those occupations are not subject to this requirement, citing silence in the City Code. That is hardly conclusive, however, given that the City Code also does not impose the drug-testing requirement at issue.[32] Either way, the City does not have the burden of showing that its regulation is the least restrictive means or that it employs the same means of achieving its goal across widely differing kinds of conduct. It need only show that its goal of protecting tour group participants from the harmful behaviors associated with drug use "would be achieved less effectively absent the" drug-testing requirement. *Ward*, 491 U.S.

---

[31] State of Louisiana, EMS Certification Commission, Examination Disclosure Form, *available at* http://new.dhh.louisiana.gov/assets/oph/ems/forms/Examination.pdf; National Registry of Emergency Medical Technicians, National EMS Certification Requirements, *available at* https://www.nremt.org/nremt/about/reg_basic_history.asp.

[32] The Court notes that while it rejects Plaintiffs' First Amendment claim, it has not been asked to pass on, and will not pass on, whether the City validly enacted whatever basis it cites as its authority for requiring the drug test. The requirement does not appear in the City Code and does not appear to exist in any duly enacted departmental regulation.

at 800. It clearly would.

## CONCLUSION

The undisputed facts demonstrate that the City's licensing scheme for tour guides is content neutral and passes intermediate scrutiny. Accordingly, it is constitutional. Plaintiffs' motion for summary judgment is **DENIED**, and the City's motion for summary judgment is **GRANTED**.

**New Orleans, Louisiana, this 9th day of July, 2013.**

*Susie Morgan*
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**